UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| OSCAR K. GRIFFIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-00637-TWP-DML |
| ) | |
| SANDERS, Ms., CHINNETTE ROWELL, and ) | |
| PARKS, Officer, ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Lela Sanders ("Sanders"), Chinnette Rowell ("Officer Rowell"), and Mary Parks ("Officer Parks") (collectively, "Defendants"). (Dkt. 101.) Plaintiff Oscar Griffin ("Griffin"), an inmate in the Indiana Department of Correction ("IDOC"), initiated this civil action pursuant to 42 U.S.C. § 1983. (Dkt. 12.) Griffin alleges the Defendants, all IDOC employees, discriminated against him and denied him the opportunity to work at the prison because he is blind; and when he was later allowed to work, he was paid less than other inmates and was given fewer work hours. (Dkt. 12 at 2-3.) The Court screened Griffin's Amended Complaint and liberally construed that Griffin asserts an Equal Protection claim pursuant to the Fourteenth Amendment. (Dkt. 13 at 2.) For the reasons explained below, the Defendants' Motion for Summary Judgment is **granted**.

**I.   SUMMARY JUDGMENT STANDARD**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56(a). On summary judgment, a party must show evidence that would convince a trier of fact to accept its version of the events. *Gekas*

*v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016).  The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).

To survive a motion for summary judgment, the non-moving party must set forth specific admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them.  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Not every factual dispute between the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II. MATERIAL FACTS

The following statement of facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to Griffin as the non-moving party. See *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). The facts are considered undisputed except to the extent that disputes of facts are noted.

### A. The Parties

At all times relevant, Griffin was an IDOC inmate housed at the Plainfield Correctional Facility ("Plainfield"). (Dkt. 101-1 at 9.) Griffin is completely blind. *Id.* at 9-10. He does not have a left eye, and he cannot see anything out of his right eye, not even light. *Id.* at 10. The optical nerve and the nervous system behind Griffin's right eye are severed. (Dkt. 101-7 at 10.)

Griffin arrived at Plainfield in April 0f 2017 and has had a few different housing assignments his arrival. Two of these housing assignments are relevant to the allegations in his Amended Complaint. Upon his arrival to the facility, he was housed in the north dorm. (Dkt. 101-1 at 11.) In the north dorm, Griffin worked nighttime sanitation and wanted to continue similar work after he was moved to the P-side of the east dorm. *Id.* at 17. The east dorm is an honor dorm. The P-side of the honor dorm is for offenders who do not have any conduct reports, and Griffin was placed here with both disabled and some non-disabled offenders. *Id.* at 12. Griffin was the only blind person on the campus when he was moved to the honor dorm. *Id.* at 12. He did not require assistance with his daily activities, and he was "quite handy." (Dkt. 101-7 at 10, 18.) Griffin did require assistance from other inmates to review his trust account statement and submit his timesheets for work. (Dkt. 101-1 at 29, 31; Dkt. 101-7 at 17-18.)

At all times relevant Sanders, an IDOC counselor, and IDOC Officers Rowell and Parks were employed at Plainfield. (*See* Dkt. 20.)

B.    **Griffin's Testimony**

1.    **Work History Prior to January 2019**

Griffin previously worked dorm detail in the GRIP program[1], under Officer Parks' supervision. (Dkt. 101-1 at 14-15.) Officer Parks knew all about him because she had been his counselor when he was in the north dorm. *Id*. After the GRIP program ended, Griffin completed his GED and the literacy program, and then received his culinary arts certificate on December 27, 2018. *Id.* at 18-19. Shortly after, Griffin was reclassified and was temporarily on "idle"[2] status, pending a new work assignment. *Id.* at 19. Griffin was told by another counselor, a non-defendant in this action, that the counselor had put in a request form so that Griffin could work dorm detail. *Id*.

2.    **Lela Sanders**

On January 10, 2019, Sanders took over the dayroom work assignments, but Griffin was not on the dorm detail assignment list in the honor dorm. *Id.* That day, Griffin had his first encounter with Sanders when she woke up the inmates in his dorm, telling them that they needed to get up and get to work. *Id*. at 17-18. At this time, Sanders did not know that Griffin was blind. *Id*. The work Sanders referred to were custodial jobs in which inmates would clean tables, telephones, and windowsills in the front lobby and front room. Sanders and Griffin exchanged a few words that were not pleasant, and then Sanders retired to her office. After Griffin explained his condition—that he was blind—Sanders made a phone call. She then she told Griffin that he did

---

[1] The GRIP (Guiding Rage into Power) program examines the origins of criminogenic conduct and undoes the characteristic destructive behavioral patterns (including addiction) that lead to transgressions. https://grip-traininginstitute.org/grip/ (last visited 1/19/2022).

[2] "Idle" classification is used when an offender is not presently assigned to a treatment, self-help, or education program, a facility operation position, or employment "due to the offender's refusal to participate, previous termination from an offender assignment, or due to offender's ineligibility for an assignment because of the offender's conduct." (Dkt. 101-3 at 3.)

not have to work because he was blind. *Id*. at 18.  Griffin told Sanders "I would like to work, I'm the one that volunteered to work." *Id*.  Sanders responded "how can you work because you [sic] blind, you can't see nothing to make sure nothing is clean." *Id*.  Griffin responded that he wanted to work, that he was doing this same work in the north dorm, and expressed that he was "as capable as everybody else." *Id*.  Sanders made a few more comments and then told Griffin that they were not going to work him, and she "kicked me out of the office." *Id.*

Griffin is suing Sanders for discrimination against his disability because she denied him the right to work, and that she and the other Defendants locked him in rooms, cussed him out, stopped him from filing grievances, and called him names and verbally assaulted him about his disability. *Id.* at 12-13.

### 3. <u>Officer Rowell</u>

Officer Rowell is one of the officers in charge of the dayroom and she told Griffin that she did not want him to work around her. *Id.* at 13-14.  Officer Rowell knew Griffin from his work in the north dorm. *Id.* at 20.  Officer Rowell responded to Griffin's informal grievance.  Her written response reads, in its entirety:

> Offender Griffin I never was disrespectful to you or your disability. You just mad because I told Mrs. Sanders that you did not need to be on dorm detail because you could not see. And that you didn't clean your own living area. Offender Griffin you was the on[e] disrespectful and cursing at staff that we could not discriminate against your disability. Threatening to sue all of us with the American Disability Act for not letting you work. I never told you that you couldn't have a job you just had to have one more compatible to your disability.

(Dkt. 101-6.)  Griffin characterized this response as stating because he is blind, he could not work, and that was the reason why they were "not working" him. *Compare id.* to Dkt. 101-1 at 13.

### 4. **Officer Parks**

Griffin is suing Officer Parks because she locked him in rooms, stood in front of the door and did not allow him to leave (thereby preventing him from working during part of the time period

5

in question), and she insulted him about his disability. (Dkt. 101-1 at 14.) Officer Parks knew about him and his condition prior to his reassignment to the honor dorm, as she was familiar with him from his participation in the GRIP program. *Id.* Officer Parks worked the same shifts as Officer Rowell, though at times she might be on the other side of the dorm. *Id.* at 16.

### 5. Work History in March 2019 and After

Eventually, in early March 2019, Griffin received an order directing him to begin the daytime sanitation job he sought. *Id.* at 26 and 30. Between April and May 2019, Griffin started a new job assignment with Project Echo doing education work in a position that paid more. *Id.* at 34. At the time of his second deposition, Griffin was working in the kitchen and bakery. (Dkt. 101-7 at 8.)

### C. IDOC Offender Work Assignments and Pay Schedule Policies

The IDOC Offender Assignments and Pay Schedule Policy 02-01-106 establishes the policies and procedures regarding employment and payment of inmates. (Dkt. 101-2, ¶ 4; *see also* Dkt. 101-3.) Eligible inmates receive work assignments based on a variety of factors including public safety and other security concerns, their individual needs, resources, prior work experience and training, and eligibility requirements for a specific assignment. (Dkt. 101-3 at 2.) The policy provides that "[w]hen possible, a[n inmate's] day shall be structured to provide for at least six and one-half (6.5) hours of organized activities per day." *Id.* at 10-11.

Policy 02-01-106 defines an offender with a disability, in relevant part, as: "Any offender encumbered with impairments or disabilities as confirmed by Health Services staff and noted by Classification staff, due to physical or mental limitations . . . which may impact the offender's ability to perform certain work or program assignments." *Id.* at 4. Further, "[a]dministrative decisions and the provision of access to programs and assignments shall be made without regard

to an offender's race, religion, national origin, sex, disability, or political views.  The Warden shall ensure that each eligible offender is provided an equal opportunity to request an assignment." *Id.* at 6.

### D. Griffin's Pay from January 2019 to May 2019

IDOC records indicate that from February 2019 through part of May 2019, Griffin was assigned custodial work, a position that requires only minimal qualifications and is categorized as a "Grade 4" position, paying $0.12 per hour.  (Dkt. 101-2, ¶ 5.)  Offenders complete and submit timesheets with the number of worked hours, and this time keeping is later entered into a spreadsheet at the facility, and those spreadsheets are kept in the ordinary course of business.  *Id.*, ¶ 6.  Griffin's IDOC spreadsheets indicate that he was paid into his inmate trust account as follows:

> a. January 2019: No Pay
> b. February 2019: 12 days, 6.5 hours per day, $0.12/hr, total $9.36
> c. March 2019: 15 days, 6.5 hours per day, $0.12/hr, total $11.70
> d. April 2019: 21 days, 6.5 hours per day, $0.12/hr, total $16.38
> e. May 2019: 21 days, 12 days at 6.5 hours per day at $0.12/hr, 5 days at 8 hours per day at $0.20/hr, and 4 days at 6.5 hours per day at $0.20/hr.

*Id.*, ¶ 8; Dkt. 101-4; Dkt. 101-5.[3]

In regard to his payments received, during his time on the custodial staff, Griffin was paid less per hour and was not allowed to work as many hours as other inmates.  (Dkt. 101-1 at 27.)[4] Griffin was assigned to work with Hill, a fellow prisoner, and Griffin and Hill were paid the same hourly wage, but Hill was allowed to get credit for 6.5 hours per shift while Griffin reported that he was only paid for one hour per day.  *Id.* at 28.  Officer Rowell was not signing off on his full hours, so his timesheets were only reflecting one hour of work per day.  *Id.* at 29.

---

[3] "Payments to inmates for work are listed by line under the transaction code 'SPXX', where SP stands for 'State Pay' and 'XX' is replaced with the month of work." (Dkt. 101-2, ¶ 11.)  A code "SP02," for example refers to Griffin being paid for work completed in February.

[4] This fact is disputed.

Griffin does not dispute that he was paid for 12 full days in February 2019, but he testified that this pay was short. *Id.* at 33. He worked the entire month of March 2019, which was more than 15 days. *Id.* at 33-34. Griffin was told that he would receive some backpay, going back to January 2019, despite not being allowed to work but never received it. *Id.* at 37.

E.  **Comparator Evidence**

At the suggestion of his counselor, Griffin met Davud Cole ("Cole"), another blind inmate at the facility, when Griffin entered the IDOC in 2017. (Dkt. 101-7 at 13.) He was not housed in the same dorm as Cole but met with him regularly before Cole was released in 2018. *Id.* at 14. Cole was completely blind and went blind while at Plainfield, but before Griffin arrived. *Id.* Cole worked and was paid to do custodial duty in the east dorm, cleaning tables, appliances, the telephones, kiosks, and windowsills. *Id.* at 15. *See* Cole's job history. (Dkt. 101-8.)

Cole attested that although he was totally blind, he was assigned to perform custodial work at Plainfield from November 5, 2012 to August 22, 2013. (*See* Dkt. 107-1, ¶¶ 2-5.) Prior to this job history, Cole, like Griffin, had been supervised by Officer Parks. *Id.*, ¶ 6. Cole attested that while performing custodial work he "was never told that [he] was unable to perform" those duties because of his blindness and "was never told that [his] work in this job was not up to appropriate standards or was unsatisfactory due to" being blind. *Id.*, ¶ 7.

### III.  DISCUSSION

Griffin contends the Defendants treatment—denying him the opportunity to do custodial work which he was qualified and able to do, and not being paid in the same manner as other offenders—was not rationally related to any legitimate state interest, and violated the equal protection rights afforded him under Article 14 of the United States Constitution. The Defendants argue they did not violate Griffin's constitutional rights and that they are entitled to summary

judgment for four reasons. First, Officer Parks lacked the requisite personal involvement for liability under 42 U.S.C. § 1983, and thus, she is entitled to summary judgment. (Dkt. 102 at 7.) Second, Griffin cannot maintain an Equal Protection claim against any of the Defendants because he is not a member of a protected class, proceeding on a class-of-one theory is foreclosed, and the Defendants did not intentionally treat him differently because he was blind. *Id.* at 10. Third, any differing treatment was rationally related to a legitimate state interest. *Id.* at 13. Fourth, that Griffin received the same pay-rate as another similarly situated offender. *Id.* at 15.

### A.     Officer Parks and Individual Liability

The Defendants argue that Griffin has not offered any evidence that Officer Parks was personally involved in denying him a job or altering his pay or hours. (Dkt. 102 at 8.) "Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation . . . . A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

Griffin "contends that Parks most assuredly approved [Sanders' and Rowell's] actions, and knowledgeably consented to them occurring" because she served as a former supervisor for Cole, "who was totally blind, and did the same work, years before." (Dkt. 107 at 12.) Griffin further argues that Officer Parks prevented him from complaining about being denied work, "locked him in a room on two separate occasions," which prevented him from working, and berated him. *Id.* at 12-13.

Griffin's arguments are insufficient to establish that Officer Parks is personally liable for the misconduct alleged. Griffin testified that Sanders was the person with the authority to make employment decisions. There is no evidence in the record that Officer Parks' opinions about Griffin's employment were considered in any employment decisions. (Dkt. 101-1 at 38-39.) There is no evidence that Officer Parks had hiring authority, or somehow intervened in any decision-making by Sanders or Officer Rowell. Griffin's assertions about Officer Parks' conduct are too vague and attenuated to form a causal connection or an affirmative link that she participated in violation of his constitutional rights.

Further, while berating or verbally abusing someone is indefensible and unprofessional, isolated verbal abuse, harassment, and unprofessional conduct do not rise to the level of a constitutional violation for which relief may be granted in a civil rights case. *See DeWalt v. Carter*,[5] 224 F.3d 607, 612 (7th Cir. 2000), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) ("The use of racially derogatory language while unprofessional and deplorable, does not violate the Constitution.") (citing *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987)). Accordingly, the Court finds that Griffin has not established that Officer Parks was personally involved in the alleged constitutional deprivation, and as such, she is entitled to summary judgment.

### B.    Equal Protection Clause

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall

---

[5] In *DeWalt* the Seventh Circuit went on to say that [s]tanding alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." *DeWalt*, 224 F.3d at 612. Since *DeWalt*, the Seventh Circuit has said that its language was too broad and that "[t]he proposition that verbal harassment cannot amount to cruel and unusual punishment is incorrect." *See Beal v. Foster*, 803 F.3d 356, 357 (7th Cir. 2015) (But, this holding is narrow, as "[r]epugnant words, like those alleged in *DeWalt*, will seldom rise to an Eighth Amendment violation."). Ultimately, "most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." *Id.* at 358. Griffin did not allege Eighth Amendment claims in his Amended Complaint, and the Court did not permit any such claims to proceed in this action based upon any allegations that he was subjected to cruel and unusual punishment by the Defendants' conduct.

'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, §1).  "The Equal Protection Clause of the Fourteenth Amendment prohibits state and local governments from discriminating on the basis of certain protected classifications and also bars governments from treating a person irrationally as a so-called 'class of one.'" *Doe v. Bd. of Educ. of City of Chi.*, 2020 WL 1445638, at *6 (N.D. Ill. E.D. Mar. 24, 2020) (citing *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)).

### 1. Class-of-One Theory

Many of Griffin's arguments in this action are based upon the legal theory that he is a class-of-one plaintiff, which is but one way to assert an Equal Protection claim.  Unfortunately, for Griffin, this legal theory fails.  A plaintiff may pursue a "class of one" Equal Protection claim if he alleges that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008). However, Defendants correctly argue that class-of-one Equal Protection claims were foreclosed in the public employment context and those claims are not cognizable in the prison workplace for the same reasons.  (Dkt. 102 at 10; *see also Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 128 S. Ct. 2146 (2008) (foreclosing class-of-one claims for public employees challenging employment decisions).) The Defendants point to *Lewis v. Henneman*, 752 F. App'x 365, 367 (7th Cir. 2019), in which plaintiff invoked the class-of-one theory, and the Seventh Circuit found the theory did not apply to the employment context generally, "let alone a prison's workplace." Id. (a non-precedential decision on February 19, 2019). Griffin argues that this non-precedential order has

11

not foreclosed Griffin's class of one claim. (Dkt. 107 at 6.) The Court disagrees as discussed in this Order, and in light of the Seventh Circuit considering a similar argument on June 28, 2019, in *Clark*, affirming the district court's judgment that these claims were foreclosed. As explained below, the Court finds this reasoning is applicable and dispositive here, and Griffin's class-of-one claim cannot survive summary judgment.

In *Clark v. Reed*,[6] the plaintiff argued that the Seventh Circuit had "never in a precedential decision applied *Engquist* to the prison-employment context." 772 F. App'x 353, 354 (7th Cir. 2019). Griffin makes this same argument here. However, the Seventh Circuit affirmed the judgment in *Clark*, finding that the district judge "rightfully concluded that Clark cannot succeed on his class-of-one claim" because of the rationale in *Engquist*. *Id.* at 354-55. The Seventh Circuit explained: "The Supreme Court has held that the 'class-of-one-theory of equal protection does not apply in the public employment context . . . . That is because a class-of-one theory 'presupposes that like individuals should be treated alike,' but '[t]o treat employees different is . . . simply to exercise the broad discretion that typically characterizes the employer-employee relationship.'" *Id.* (internal citations omitted). Further the Seventh Circuit found that this same rationale for public employment, "applies with at least as much force in the prisoner-employment context, because courts defer to the discretion of prison officials to operate their institutions." *Id.* at 355 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)).

In light of *Clark*, and the reasoning that "it would be anomalous to allow a prisoner to bring such a [class-of-one] claim when corrections officers themselves cannot[,]" **Griffin's class-**

---

[6] "The Court has found some district court cases extending *Engquist* to class-of-one equal protection claims by prisoners." *Clark v. Reed*, 2018 WL 11307318, at *3-*4 (C.D. Ill. May 7, 2018) (collecting cases). "The Seventh Circuit does not appear to have directly addressed whether *Engquist* bars claims by prisoners about employment decisions . . . . This Court holds that *Engquist* bars Plaintiff's class-of-one claim based on the termination of his employment. The Seventh Circuit unpublished cases cited above do not preclude that conclusion." *Id.*

**of-one theory is foreclosed**. *Clark*, 772 F. App'x 353 at 354 (quoting *Alexander v. Lopac*, 2011 WL 832248, at *2 (N.D. Ill. Mar. 3, 2011)). Because Griffin's class-of-one theory is not cognizable in this action, the Court limits its analysis to Griffin's claims under a protected class theory.

### 2. Protected Class Theory

"The Equal Protection Clause generally protects people who are treated differently because of membership in a **suspect class** or who have been denied a fundamental right." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 601 (7th Cir. 2016) (emphasis added). The Supreme Court has held that disability is not a 'suspect classification'[7] under the Equal Protection Clause, so a plaintiff alleging an equal-protection violation on the basis of their disability **also has to show** that the state actor's discrimination was not **rationally related to a legitimate state interest**." *Doe*, 2020 WL 1445638, at n.5 (emphasis added, collecting cases).

"Rational basis review requires the plaintiff to prove that (1) the state actor intentionally treated [him] differently from others similarly situated; (2) this difference in treatment was caused by [his] membership in the class to which [he] belongs; **and (3) this different treatment was not rationally related to a legitimate state interest**." *Srail,* 588 F.3d at 943 (emphasis added).

The Court finds that its analysis ultimately hinges on the third element of rational basis review, whether or not Griffin has carried his burden to show that any alleged discrimination by the Defendants was not related to a legitimate state interest. Thus, for purposes of summary judgment and in the light most favorable to Griffin, the Court assumes that Griffin has satisfied the first and second elements of rational basis review--that he was intentionally treated differently

---

[7] "Suspect classes include race, alienage, and national origin. Another typical equal protection challenge is based on denial of fundamental right. Fundamental rights include freedom of speech and religion. With both suspect classes and denials of fundamental rights, the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause." *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (internal citations omitted). Griffin is not a member of a suspect class and he does not assert that the Defendants infringed upon a fundamental right. Thus, a standard lesser than strict scrutiny, only rational basis review applies. *Id.*

than other similarly situated persons, and that the differential treatment was based upon Griffin's blindness.

"Under traditional equal protection analysis, it is a violation of the Fourteenth Amendment for the state to discriminate against disabled persons in an irrational manner or for an illegitimate reason. However, the Fourteenth Amendment allows the state to single out the disabled for different treatment so long as it has a rational or legitimate purpose." *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 738 (7th Cir. 2000). A state "may rely on disability 'as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests.'" *Id.* (quoting *Kimel v. Fla. Bd. of Regents*, 120 S. Ct. 631, 646 (2000)). There is a presumption that distinctions made by the state based on disability are rational and legitimate, and "[t]he burden rests on the individual to demonstrate that the government's claimed purpose is illegitimate or that the means used to achieve that purpose are irrational." *Id.* at 738.

Meeting this third element is a difficult hurdle for any plaintiff. "There is a rational basis for an action if there is 'any reasonably conceivable state of facts that could provide a rational basis.'" *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 263 F. Supp. 3d 705, 728 (N.D. Ill. 2017) (quoting *Srail*, 588 F.3d at 946). "A rational basis 'may be based on rational speculation unsupported by evidence or empirical data.'" *Srail*, 588 F.3d at 947 (quoting *F.C.C. v. Beach Commc'n, Inc.*, 508 U.S. 307, 314-15 (1993)). Additionally, "the State need not articulate its reasoning at the moment a particular decision is made." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 121 S. Ct. 955, 964 (2001).

The Defendants argue that any differing treatment of Griffin "was rationally related to a legitimate state interest." (Dkt. 102 at 13.) The Defendants contend that Sanders and Officer Rowell "only showed hesitation for assigning Griffin to clean [the dorm]" because he could not

14

"ensure that it was actually clean," and he did not even clean his own living area. *Id.* at 14; Dkt. 108 at 9. Further, Defendants "were concerned about whether Griffin was able to complete the specific tasks this job entailed," as well as that the job presented a potential safety risk. (Dkt. 108 at 10.) For example, Griffin would have to navigate multiple tables and the use of cleaning chemicals and cleaning instruments, all without being able to see his surroundings, and the Defendants state it was "eminently reasonable . . . to believe that a person who suffers from total blindness, requires other inmates to help him with [filling out time sheets and reviewing his trust account statements], and does not even clean his own living area" would not be best suited for this work. *Id.*

Griffin argues that it was against IDOC policy 02-01-106 to make assignment determinations for offenders regarding their disabilities, and that it has been held that a decision to go against one's internal policy is an irrational one. *See Zavatsky v. Anderson*, 130 F. Supp. 2d 349, 357 (D. Conn. 2001) (plaintiff stated an equal protection violation "because there would appear to be no 'readily apparent' justification for the defendants' deviation from the agency's internal policy."). And though this point is well taken, the Court notes that the policy states that offenders receive work assignments based on "a variety of factors" such as public safety and security concerns and the individual needs of the offender. (Dkt. 101-3 at 2.)

The Court opines that there are a number of reasonable inferences that could provide a rational basis for the Defendants' decision to delay assigning Griffin to a custodial job at the prison. Griffin was moved to a new dorm location, which may have differed from his previous dorm assignment where he worked custodial duties, such that it presented certain initial or varying degrees of safety risks. Griffin was under different supervision than his previous counselor, and Sanders, who Griffin testified had primary authority to make work assignments, was not familiar

15

with him, his work ability, or his ability to independently navigate given his visual impairments. There were identifiable gaps of time between Cole's employment as a custodial worker and Griffin's request to have a similar job in the honor dorm, and while a certain work assignment was permitted in the past, it may not necessarily continue to be permitted in the future, for reasons that are rational and legitimate. Additionally, specific individuals may possess differing employment qualities which may make one individual more suitable to perform the required work than another. For example, a visually impaired person who kept his housing area clean and tidy might have been a better candidate for a custodial position, than another whose personal area was reportedly not well kept. After an approximate two-month delay, Griffin was able to return to the custodial job he desired and went on to obtain positions in a higher pay grade category which required heightened skills.

The Court does not find that Griffin has presented evidence to meet his burden that the Defendants' purpose for his employment delay was based on an illegitimate or irrational purpose. Accordingly, the Defendants are entitled to summary judgment on his Equal Protection claims related to his work assignment.

### 3. **Inadequate Pay**

Lastly, the Court must address Griffin's raised issues regarding his wages. Though Griffin argued in his Amended Complaint that he was not paid the same hourly wage as other inmates and did not receive the same number of hours in a day as other inmates, the undisputed record provides evidence to the contrary. Griffin admitted that when he was eventually allowed to work the custodial job, he was paid at the same rate as his co-worker, Mr. Hill. The records reflect that when Griffin was paid, he was paid at the standard state wage rates of pay pursuant to IDOC policy for

16

his job type. (Dkt. 101-3.) Daily and monthly pay are based upon 6.5 hours per day, and 22 days of work per month. *Id.* at 17.

Relevant to his allegations from January 2019 to March 2019, Griffin's payment spreadsheets and trust account statement indicate that he was not paid at all in January; was paid for 12 days at 6.5 hours per day at the standard rate of $0.12/hr in February; and was paid for 15 days at 6.5 hours per day at the standard rate of $0.12/hr in March. (Dkt. 101-2 at 3.) It appears that the fact issues are not that Griffin received an appropriate standard rate of payment based upon his job classification or that he was not getting credit for 6.5 hours/per day, as he alleges. The evidence refutes those aspects of his Equal Protection claims.

However, the Court acknowledges that there are fact issues that exist in terms of Griffin's total pay between January 2019 and March 2019. For example, the record does not show that he was ever paid for any work, or given backpay, in January 2019, when he was prevented from working his custodial job beginning on the 10th of that month. Griffin was paid for a portion of time in February, and it is unclear to the Court, whether this was payment for hours that were physically worked as the defendants contend, or if this was part of any backpay that Griffin testified he was supposed to receive. Though not explicitly addressed by the parties, this raises questions as to whether Griffin was entitled to more than 12 days of payment in February 2019. Further, and specifically argued by Griffin, is the question of whether or not he was properly paid for his work in March 2019, as he testified, he worked the *entire* month, but the spreadsheets indicate he was only credited for 15 days of work. (Dkt. 107 at 13.)

Griffin's argument that the Defendants have not submitted actual timecards completed by Griffin showing the days and hours worked, but rather, have submitted summary spreadsheets not prepared by Griffin is well taken. *Id.* But, Griffin has not produced any evidence, nor does the

17

Court find any in the record, that Sanders or Officer Rowell were responsible for entering these timesheets or were responsible for ensuring that his wages were appropriately paid to him and deposited to his trust account. Griffin testified only that Officer Rowell was not giving him credit of 6.5 hours on the days that he worked and that he was only given 1 hour a day, but the record reflects that Griffin was receiving a 6.5-hour allotment on all the days recorded on the spreadsheets. (Dkt. 101-1 at 27; Dkt. 101-4.) Moreover, Griffin's testimony is that he used the assistance of other inmates to help him with his timesheets and to see the balance in his trust account statement when he checked it. (Dkt. 101-1 at 29, 31.)

The Court finds that there is not sufficient evidence to show that Sanders or Officer Rowell were personally liable for any payments that Griffin argues he was shorted or denied. Accordingly, the Defendants are entitled to summary judgment on Griffin's Equal Protection claims related to his wages.

### C. **Qualified Immunity**

For the first time, in their reply, the Defendants argue in a single sentence[8] that they are entitled to qualified immunity. (*See* Dkt. 108 at 1.) The Defendants' brief in support of their Motion for Summary Judgment does not contain an argument about qualified immunity. (Dkt. 102.) Indeed their brief makes no mention of the defense by name. *Id.* As the Defendants must be aware, arguments raised for the first time on reply are waived. *See, e.g., Griffin v. Bell*, 694 F. 3d 817, 822 (7th Cir. 2012). Further, the Court finds it particularly odd that the Defendants would raise this argument for the first time in reply, since it is Griffin's burden as the plaintiff to show that (1) the [state] official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546

---

[8] "Griffin's equal protection claim fails because the job was available to him, he received the same pay-rate as another similarly situated offender and as such Defendants are entitled to qualified immunity." (Dkt. 108 at 1.)

18

(7th Cir. 2018) (internal quotations and citations omitted). Griffin cannot, of course, satisfy this burden when the Defendants raise an argument in their final brief. In effect, the qualified immunity defense has been waived.

In this case, Defendants waiver it is of no material consequence, because as discussed above, there is no constitutional violation. Thus, the Court need not have addressed the qualified immunity defense to Griffin's claims had it been timely raised in the Defendants' brief in support of their Motion for Summary Judgment. However, the Court reminds Defendants that such defense is to be timely raised to avoid waiver in the future.

## IV.  CONCLUSION

Griffin has failed to meet his burden of showing a genuine dispute of material fact which must be presented to the trier of fact.[9] For the reasons explained above, the Defendants' Motion for Summary Judgment, Dkt. [101], is **GRANTED**. Final Judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 1/20/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Oscar K. Griffin, #263141
PLAINFIELD CORRECTIONAL FACILITY
Inmate Mail/Parcels
727 Moon Road
Plainfield, Indiana  46168

Eric Antonio Pagnamenta
INDIANA ATTORNEY GENERAL'S OFFICE
eric.pagnamenta@atg.in.gov

---

[9] Recruited counsel's assistance in this matter was exemplary and is sincerely appreciated by the Court.

19

John Russell Millikan, IV
INDIANA ATTORNEY GENERAL'S OFFICE
john.millikan@atg.in.gov

Molly Michelle McCann
INDIANA ATTORNEY GENERAL'S OFFICE
molly.mccann@atg.in.gov

Zachary Robert Griffin
INDIANA ATTORNEY GENERAL'S OFFICE
zachary.griffin@atg.in.gov

Robert F. Hunt, Recruited Counsel
THE LAW OFFICE OF ROBERT J. HUNT, LLC
rfh@indianawagelaw.com

Robert J. Hunt, Recruited Counsel
LAW OFFICE OF ROBERT J. HUNT, LLC
rob@indianawagelaw.com